[No. 27983.  *En Banc.*  November 22, 1940.]

CHARLES R. CROUCH et al., *Respondents*, v. HULETT J.
WYCKOFF et al., *Appellants.*[1]

*J. Speed Smith* and *Henry Elliott, Jr.*, for appellants.
*Philip Tindall*, for respondents.

JEFFERS, J.—This action was instituted by Charles R.
Crouch and Evelyn G. Crouch, his wife, against

[1]Reported in 107 P. (2d) 339.

Dr. Hulett J. Wyckoff and wife, to recover damages from defendants for claimed malpractice. The claimed negligence is based upon the fact that Mrs. Crouch, while a patient of Dr. Wyckoff, was placed in a plaster of Paris cast for a period of about four months; that, during the time Mrs. Crouch was in the cast, Dr. Wyckoff made no inquiry or investigation to determine her condition; and that, as the result of the excessive length of time she was left in the cast, she suffered the injuries of which she complains.

Defendants by their answer deny all allegations of negligence; deny that Mrs. Crouch was left in the cast for an excessive length of time; and allege affirmatively that any injury or damage sustained by Mrs. Crouch was caused and contributed to by her failure to follow the instructions of defendant doctor.

The cause came on for hearing before the court and jury. At the close of plaintiffs' case, defendants challenged the sufficiency of the evidence, which challenge was denied. Defendants then proceeded to put on their evidence, and at the conclusion of all the evidence, defendants moved that the case be taken from the jury, and a verdict directed in favor of defendants. This motion was denied. The case was then submitted to the jury, which returned a verdict in favor of plaintiffs. Alternative motions for judgment notwithstanding the verdict and for new trial were made and denied, and judgment on the verdict was entered November 20, 1939. This appeal by defendants followed.

Appellants assign error, first, on the overruling of the challenge to the sufficiency of the evidence; second, in denying the motion for a directed verdict; third, in denying the motion for judgment notwithstanding the verdict; and fourth, in entering judgment in favor of respondents.

We shall hereinafter refer to Dr. Wyckoff as though

he were the only appellant, and to Mrs. Crouch as though she were the only respondent.

The sole question to be determined on this appeal is whether or not the evidence was sufficient to support any charge of negligence. In determining the question, we must, of course, consider the evidence in the light most favorable to respondent.

From the testimony, the jury would have been justified in finding the following facts relative to the condition of Mrs. Crouch prior to and at the time she was placed in the cast by appellant.

Mrs. Crouch was taken down with infantile paralysis on November 27, 1934, and as the immediate result of this disease, she practically lost the use of her body from her hips up. She could not use her arms or hands, and could hardly speak. This was her condition on December 6, 1934, when she was taken to the Ballard hospital, where she remained until January 3, 1935, when she was removed to her home. When respondent returned to her home, she was some better, and after some of the soreness had left her muscles, certain treatments were administered, under the directions of Dr. Murray, an orthopedic surgeon. These treatments consisted largely of warming the arms and hands with a hot water bag or hot cloths, and then massaging the arms and hands.

As time went on, respondent was permitted to exercise her arms, and for this purpose a trapeze was fixed above her bed. In order to get her hands up to this trapeze, respondent had to grip her hair, and work her hands up to the bar in that way. After about a year and a half of such treatment and exercise, respondent's lower arms and hands had improved until she could close her hands and straighten the fingers against resistence, and could rotate her wrists.

The condition of respondent's arms and hands, on or

about July 7, 1936, is shown by the testimony of appellant, who examined her at that time, before the cast was placed on. According to appellant's testimony, respondent could rotate her arms in various directions, and in holding her arms down by her side, she could rotate them in both directions. By holding the upper arm to her side and holding the forearm out at right angles to the body, she had a good range of rotation. The forearm muscles largely control the fingers, and respondent could use these forearm muscles in opening and closing her hands, and she had reasonably good power in the muscles which flexed the fingers. There had not been much, if any, improvement in the muscles of the shoulders which raise the arms, and it was practically impossible for respondent to raise her arms to a horizontal position or up above her head, without resting her elbows on something, or without some other assistance.

At the time the cast was put on, as appears from the testimony of respondent and others of her household, respondent, by resting her elbows on something, could do many things with her hands, such as cut out pictures, untie knots in the laces of her little boy's shoes, clean out grapefruit, hold a broom and sweep a little, peel potatoes, shell peas, comb her hair, if someone would hand her the comb, write some. She was finally able to go to the bathroom unattended. The lower part of her body was not affected, and after her strength returned, she was able to walk about, and had the normal use of her lower limbs.

Respondent became dissatisfied with Dr. Murray, apparently because some of the exercises he required her to do tired her, and so she consulted appellant, who, the testimony shows, was an orthopedic surgeon and had had many years of experience in that work generally, and also many years of experience in treating

patients afflicted with infantile paralysis. At the time appellant agreed to treat respondent, he informed her that he would not take the case unless she would follow his instructions.

This was the condition of respondent at the time she was placed in the cast on July 7, 1936. Appellant's testimony shows that it was his opinion that respondent had not been receiving proper treatment, in that she had been allowed to use her muscles too much. In his opinion, that should not have been allowed, but the muscles should have been allowed to rest, in order to build up their strength. To accomplish this complete rest of the muscles, the only way is to place the patient in a cast, and it was for the purpose of giving complete rest to the shoulder muscles and the muscles which raise the arms that the cast was placed on respondent. It appears that it is impossible to tell how much improvement may be obtained by this treatment, as it is impossible to tell just how far the muscles have been affected by the disease.

According to respondent's testimony, appellant placed her in a cast which covered her body from her neck to her hips, and extended down over the arms to the first joint of the fingers and thumbs. It appears that, with the exception of two visits made by appellant a few days after the cast was put on, appellant did not visit respondent until November 11th, when the cast was removed. Respondent was informed by appellant that he would tell her when the cast was to be taken off, and that if there was any trouble she was to call him. It does not appear that appellant was called, or that the cast caused respondent any particular trouble, until November 10th, at which time the cast became painful, and respondent's husband called appellant, who the following day removed the cast.

It appears that this stiffening of the joints is not accompanied by any pain.

After the cast was removed, respondent's wrists and fingers were practically rigid. She could not flex her fingers or rotate or bend her wrists, although there seemed to be a slight improvement in some of the shoulder muscles. Appellant advised that a certain course of treatment would be necessary to restore flexibility to the wrists and fingers, and respondent was placed in the care of Miss Brask, who was employed by appellant, and who had had experience in treating infantile paralysis cases by physiotherapy methods. The treatments recommended by appellant and given by Miss Brask consisted of massaging and manipulating the fingers and wrists, after the application of heat or hot water, and some treatment of the muscles. These treatments continued for some four months, although it appears that respondent did not go to the office of Miss Brask as often as she was advised by appellant to go, or as often as Miss Brask advised would be necessary. However, it appears that, when respondent did not go to Miss Brask's office, and even when she did, respondent's husband, in so far as he was able, was administering at home what respondent contends was the same treatment as that given by Miss Brask.

It finally became evident to Miss Brask that respondent was not making the improvement which she should; and, after consulting with appellant, it was decided to put respondent under an anesthetic, and attempt to break down and manipulate the fingers and wrists. This course was followed out, and after this had been done, appellant informed respondent that she would have to continue the treatments, as theretofore given by Miss Brask, in order not to lose the effect of what had been done. Respondent continued to take

treatments from Miss Brask for some time, but after some weeks discontinued the treatments, although it appears that respondent's husband has continued to massage and manipulate her fingers and wrists.

These treatments, as given by Miss Brask and Mr. Crouch, were at first accompanied by a great deal of pain, but as the treatments continued, and after the breaking down of the fingers and wrists by appellant, the pain has decreased, until at the time of the trial, there was practically no pain accompanying such treatments. After all the treatments and up to the time of trial, very little flexibility had been restored to the wrists and fingers. We find, however, in the direct examination of respondent, the following statement, which is unexplained, relative to her condition at the time of trial: "The upper part of my arms were weak, *and my forearms were strong just like they are now.*"

Appellant testified that, as a result of immobilization, stiffness in the joints may be expected, and often results, and that it often requires long and continuous manipulation, massage, diathermy, and painful use of the joints, to restore them to normal function.

The only medical testimony herein is that given by appellant and Dr. John F. LeCocq, who was called as a witness for appellant. Dr. LeCocq is an orthopedic surgeon, and has also had many years of experience in this work generally, and in the treatment of infantile paralysis cases. While both of these doctors testified that the maximum benefit from the cast would probably be attained in eight weeks, neither of them testified that it was unusual, or that it was not good practice, to leave a cast on for a longer period, and they both stated that, in their opinion, no injury or harm would or did result in this case from leaving the cast on for the additional length of time over the eight weeks period. Both of these men also testified that

stiffness in the immobilized joints may be expected; that it usually occurs in from three to eight weeks after a cast is put on; and that the stiffness would not increase or be aggravated by leaving a cast on for the additional length of time this cast was left on, for the reason given by appellant, that the stiffness becomes fixed and would not change.

Dr. LeCocq testified that it was the approved and accepted practice, in infantile paralysis cases, to put a cast on the patient, to rest the muscles, and that in many cases where the cast was put on and the patient sent home, the doctor did not again see the patient until it was time to remove the cast and put on a brace, the patient being informed to communicate with the doctor if anything seemed wrong. Dr. LeCocq further testified that, in his opinion, appellant, in applying the cast and in treating respondent thereafter, used that degree of care that is exercised by the ordinary orthopedic man practicing in that community. There is no testimony, medical or otherwise, which tends to show that appellant, in his treatment of respondent, did not exercise that degree of care, diligence, and skill which is ordinarily possessed and exercised by members of the medical profession in the same line of practice, in the same or similar locality, but the direct medical testimony is that appellant did use such care, diligence, and skill.

Respondent does not contend that appellant was negligent in placing her in a cast, or that he was negligent in leaving her in the cast for a period of from six to eight weeks; but her sole contention is that appellant was negligent in leaving her in the cast for the additional eight weeks, without any investigation to determine her condition, and that this negligence was the cause of her condition, respondent arguing that it is unnecessary to have the opinion of persons skilled in

the particular science to show unskilled and negligent treatment.

■ We recognize the rule that, in a malpractice action, it is not necessary to prove negligence by direct and positive evidence, but it may be proved, in certain cases, by a chain of circumstances, from which the ultimate fact required to be established is reasonably and naturally inferable; and in such cases, it is unnecessary to have the opinion of persons skilled in the particular science to show negligent treatment, but the facts alone prove negligence. *Wharton v.Warner,* 75 Wash. 470, 135 Pac. 235; *Wynne v. Harvey,* 96 Wash. 379, 165 Pac. 67; *Swanson v. Hood,* 99 Wash. 506, 170 Pac. 135; *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697; *Gross v. Partlow,* 190 Wash. 489, 68 P. (2d) 1034; *Atkins v. Clein,* 3 Wn. (2d) 168, 100 P. (2d) 1. However, a reading of the cited cases will show that, under the facts as established in each case, the negligent act, such as leaving a sponge in the body after an operation, or a spring from an instrument used by the doctor, was so apparent that no expert testimony was necessary to establish the negligence, that being established by the facts alone.

■ It not being contended that appellant was negligent in placing respondent in a cast, or in leaving her there for a period of from six to eight weeks, and it appearing from all the medical testimony in this case that no harm would or did result from leaving the cast on for the additional time, as the stiffness occurs in from three to six weeks, and does not thereafter change, what testimony, direct or circumstantial, have we in this record which tends to prove, or from which it can reasonably be inferred, that the stiffness found in respondent's fingers and wrists, when the cast was removed, a large part of which we may concede is still

282

there, was caused by leaving respondent in the cast for the additional time? All that appears herein, briefly stated, is that, at the time the cast was placed on her, respondent had certain use of her wrists and fingers, but very little use of her upper arms and shoulders; that respondent was properly treated by appellant, in an endeavor to restore some part of the normal use of the muscles of the upper arms and shoulders; and that a bad result followed. A doctor is not to be charged with negligence because the result is not what is desired. *Williams v. Wurdemann,* 71 Wash. 390, 128 Pac. 639; *Lorenz v. Booth,* 84 Wash. 550, 147 Pac. 31; *Hollis v. Ahlquist,* 142 Wash. 33, 251 Pac. 871.

In the instant case, we are of the opinion that negligence cannot be based merely upon the fact that, after the cast was removed, there was stiffness in respondent's wrists and fingers. The medical testimony is all to the effect that stiffness is to be expected in a variable degree, and the testimony is that the condition of respondent's fingers and wrists after the removal of the cast was not unusual, except that they did not seem to respond to treatment as quickly as in some cases. Conceding that an unfortunate result followed the use of this cast, in so far as respondent's fingers and wrists are concerned, a doctor is not a guarantor, and the mere fact that a bad result may follow an operation is not of itself evidence of negligence. In *Brant v. Sweet Clinic,* 167 Wash. 166, 8 P. (2d) 972, we stated:

"The mere fact that a bad result may follow an operation is not of itself evidence of negligence. *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803.

"The rule in malpractice actions is that

"' . . . a surgeon is not liable merely because of a bad result. *Peterson v. Wells,* 41 Wash. 693, 84 Pac. 608. And that he is not responsive in damages in a malpractice suit, if the treatment which he employs is that which is recognized and approved by those

reasonably skilled in his profession, practicing in the same neighborhood and in the same line of practice, and if he administers that treatment with a degree of skill and diligence as such practitioners ordinarily exercise in like cases.' "

As we have stated, the testimony of Dr. LeCocq is to the effect that appellant, in treating respondent, used the degree of care and skill required by the above rule, and there is no testimony to the contrary.

Respondent contends, however, that appellant, knowing that stiffness in the joints would probably follow as the natural result of placing respondent in a cast, was negligent in not visiting respondent and determining what her condition was, at least at the expiration of six or eight weeks. It appears from the testimony of appellant that he had left casts on longer than the one was left on in the instant case; and that, from his experience, he had no reason to believe, and did not believe, that any stiffness which might result from placing respondent in the cast would in any way be increased or aggravated by leaving the cast on for the time it was left on; that, in his opinion, there was nothing he could do, and no reason for him to investigate respondent's condition.

However, it does appear that, about the middle of September, appellant called respondent's husband and informed him that they should get a brace. It appears from the medical testimony of appellant and Dr. LeCocq that, in these cases, when the cast is removed, a brace should be put on immediately, to hold the arms in the same position they were in while in the cast. Because of some trouble between respondent's husband and Mr. Cullen, the brace maker, over a former brace which Mr. Cullen had made for respondent, Mr. Cullen would not make a new brace until the money to pay for it had been given to appellant.

Mr. Crouch did not give appellant the money to pay for the brace until November 10th or 11th, which was the time the cast was taken off and the brace put on.

We do not desire to be understood as holding that the failure to furnish a brace or some other appliance would be a justification for the failure to remove a cast, where some condition was shown to exist which required the removal of the cast. In the instant case, it was shown that it was not necessary, and not the usual practice, to investigate these cases, where the patient is allowed to return home, unless some complaint is made by the patient, or unless request is made so to do. We are of the opinion that, had respondent's husband procured and furnished a brace when requested by appellant so to do, the cast would have been removed some time before it was.

However, we are of the opinion that the question of whether or not the failure of respondent to furnish a brace was the reason for appellant's not sooner removing the cast, is immaterial, in view of the fact that there is no evidence here which tends to establish that appellant was negligent in leaving the cast on for the period he did, nor is there any testimony which tends to show that, had appellant made an investigation at the end of the six or eight weeks period, he would have found a condition to exist different from the condition shown to exist at the time the cast was removed. This being true, how can it be said that it is not negligence for a doctor to leave a cast on for eight weeks, but it is negligence to leave it on nine, ten, twelve, or sixteen weeks, where it is not shown that any different condition would or did exist at the end of the sixteen weeks than was there at the end of eight weeks?

We are clearly of the opinion that the questions of whether or not the leaving of this cast on for the additional period of two months caused the injury com-

plained of, or whether or not it is reasonable to infer that it did, are questions which can properly be determined only by medical experts, and are not questions which may be determined by circumstances such as appear in this case, and upon which respondent relies to prove negligence. 48 C. J. 1150, § 157; *Dishman v. Northern Pac. Beneficial Ass'n,* 96 Wash. 182, 164 Pac. 943; *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697.

Appellant contends that respondent was guilty of contributory negligence, in that she did not follow his instructions. This question becomes immaterial, in view of our conclusion that the facts as established do not show negligence on the part of appellant.

We are therefore of the opinion that there is no evidence, and no reasonable inference from the evidence, to sustain respondent's contention that appellant was negligent; and that to allow the judgment in this case to stand would be to say that the jury could speculate upon the question of appellant's negligence.

The judgment of the trial court is reversed, with instructions to dismiss the action.

STEINERT, ROBINSON, SIMPSON, and DRIVER, JJ., concur.

BEALS, J. (dissenting)—Being of the opinion that there was presented a question upon which the jury was required to pass, I dissent from the conclusion reached by the majority.

BLAKE, C. J., MAIN, and MILLARD, JJ., concur with BEALS, J.